**Karl Allen FONTENOT, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–88–571.**

Court of Criminal Appeals of Oklahoma.

June 8, 1994.

Petition for Rehearing Denied and
Mandate Ordered Issued
Sept. 30, 1994.

George Butner, Wewoka, trial counsel for appellant.

Cindy G. Brown, Asst. Appellate Indigent Defender, Norman, appellate counsel for appellant.

William Peterson, Dist. Atty., Chris Ross & Linda G. Evans, Asst. Dist. Attys., Ada, trial counsel for appellee.

Susan B. Loving, Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, appellate counsel for appellee.

### OPINION

CHAPEL, Judge:

Karl Allen Fontenot was tried by jury and convicted of First Degree Malice Aforethought Murder (21 O.S.Supp.1982,

§ 701.7) (Count III), Kidnapping (21 O.S. 1981, § 741) (Count II) and Robbery with a Dangerous Weapon (21 O.S.Supp.1982, § 801) (Count I), in Hughes County District Court, Case No. CRF–88–43, before the Honorable Donald E. Powers, District Judge. Fontenot received a twenty year prison sentence for the robbery conviction and a ten year prison sentence for the kidnapping conviction. The jury found three aggravating circumstances and sentenced Fontenot to death for the murder conviction. We affirm all counts, but must remand[1] the murder conviction for resentencing to afford Fonte-

not the "life without parole" jury instruction to which he is entitled.[2]

The facts surrounding the abduction and murder of Donna Harraway are set forth generally in *Fontenot v. State*, 742 P.2d 31 (Okl.Cr.1987). In that opinion, this Court reversed Fontenot's first set of convictions and remanded for a new trial.[3] The present appeal is from the convictions obtained against Fontenot during his second trial. Any additional facts implicated in this appeal will be set forth in the discussion of those propositions to which they relate.

1. Because we are remanding this case to the trial court for resentencing, the second stage errors Fontenot raises in propositions VII, VIII, IX, X, XI, XIII, XIV and XVII will not be addressed. Propositions XV, XVI and XVIII raise both first and second stage errors. Review of theses propositions will be confined to the first stage errors alleged.

2. The Oklahoma Legislature enacted the "life without the possibility of parole" option in November of 1987. *See* 21 O.S.Supp.1987, §§ 701.9 and 701.10. Although Fontenot committed the offenses at issue prior to this date, his second trial and conviction did not occur until June of 1988—well after the statute's enactment. Under these circumstances, this Court's recent opinions in *Salazar v. State*, 852 P.2d 729 (Okl. Cr.1993) and *Hain v. State*, 852 P.2d 744 (Okl.Cr. 1993), require that Fontenot's case be remanded for a new sentencing proceeding providing him with the life without parole punishment option. We note that Fontenot did not request an instruction on life without parole. As we stated in *Salazar*, however, the error resulting from instructions which fail to provide the proper range of punishment is fundamental and cannot be waived.

The dissent argues that the Legislature has effectively precluded this Court from applying the *Hain* and *Salazar* holdings to Fontenot's case. Shortly after those opinions were handed down, the Legislature amended the statute setting forth the procedures to be followed when this Court remands a capital case for resentencing. Upon remand, the sentencer may now impose "any sentence **authorized by law at the time of the commission of the crime**...." 21 O.S.Supp.1993, § 701.10 a (emphasis added). The dissent claims this amendment, which was expressly made retroactive, prohibits this Court from granting relief under *Salazar* and *Hain* to all defendants whose cases are handed down after its enactment.

The Legislature did not, however, amend 21 O.S.Supp.1987, § 701.9, which clearly provides that the punishment for first degree murder shall be life, life without parole or death, and that these punishment options are effective upon

"conviction." Fontenot was convicted **after** this provision was enacted, and was thus entitled to have his jury instructed on the life without parole sentencing option. *See Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). The trial court erred in failing **sua sponte** to instruct Fontenot's jury in accordance with section 701.9. The Legislature's procedural amendments to the remand provisions in section 701.-10a did not obviate the trial court's section 701.9 sentencing error.

Moreover, we rejected a similar argument raised by the State in its Petition for Rehearing in *Salazar v. State*, 859 P.2d 517 (Okl.Cr.1993) (order denying petition for rehearing). In response to the State's claim that the amended section 701.10a warranted rehearing in Salazar's case, we stated as follows: "To apply [section 701.10a] to Salazar would deprive him of a sentencing option that this Court has stated was available to him in *Wade v. State*, 825 P.2d 1357 (Okl.Cr.1992), and *Allen v. State*, 821 P.2d 371, 376 (Okl.Cr.1991), and would result in harsher penalty options, which would violate the prohibition against imposing a harsher punishment in an ex post facto manner." (Citations omitted).

Fontenot committed his crime before but was tried after the life without parole provision became effective. He was therefore similarly situated to Salazar. Accordingly, *Wade* and *Allen* also granted *Fontenot* the right to have his sentencer instructed on the life without parole option. The fact that the Legislature's amendment to section 701.10a was enacted before rather than after this Court rendered an opinion in Fontenot's case cannot deprive him of this right.

3. Fontenot and Tommy Ward were originally tried together for the kidnapping, robbery and murder of Mrs. Harraway. This Court determined that the admission of Ward's confession during Fontenot's trial constituted reversible error. Ward's convictions were reversed on identical grounds in *Ward v. State*, 755 P.2d 123 (Okl. Cr.1988). Both Ward and Fontenot were retried separately. Ward was also found guilty on all three counts at his second trial, but received a life sentence for his murder conviction.

## ISSUES RELATING TO
## JURY SELECTION

█ In his eighteenth proposition, Fontenot claims that the trial judge erred in denying his pretrial motion to have the jury panel individually voir dired. He argues that the history of the case, the large number of venirepersons subject to pretrial publicity and the special scrutiny required in capital cases merited individual voir dire. We disagree.

█ This Court has consistently held that there is no right to individual voir dire. *See Trice v. State*, 853 P.2d 203, 209 (Okl.Cr. 1993); *Douma v. State*, 749 P.2d 1163, 1165 (Okl.Cr.1988). Whether to grant a motion for individual voir dire is a decision resting within the trial judge's sound discretion. *See Trice, supra* at 209. *See also Brown v. State*, 743 P.2d 133, 137 (Okl.Cr.1987). Fontenot has not demonstrated an abuse of discretion. Accordingly, this proposition is denied.

## ISSUES RELATING TO
## GUILT/INNOCENCE

Fontenot argues in his first proposition that his confession was not voluntary and should therefore have been suppressed. He claims that the police used improper and coercive interrogation techniques to exploit his mental deficiencies. According to Fontenot, his explicit waiver of *Miranda*[4] rights and subsequent confession was no more than the product of police exploitation of his low mental capability. We disagree.

█ The ultimate test of the voluntariness of a confession is whether it is the product of an essentially free and unconstrained choice by its maker. *See Crawford v. State*, 840 P.2d 627, 635 (Okl.Cr.1992), *citing Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). A confession is involuntary or coerced if the "totality of the circumstances" demonstrates

that the confessor did not freely decide to give the statement. *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Under the totality of the circumstances approach, both the characteristics of the accused and the details of the interrogation are considered. *Turner v. State*, 803 P.2d 1152, 1158 (Okl.Cr.1990), *cert. denied*, 501 U.S. 1233, 111 S.Ct. 2859, 115 L.Ed.2d 1026 (1991), *citing Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Fontenot cites the testimony of Dr. Sandra Petrick, a clinical psychologist, and Dr. Joel Dryer, a psychiatrist, as evidence of his mental deficiencies. Dr. Petrick had interviewed Fontenot on May 17, 1985, for the limited purpose of determining whether he was competent to stand trial.[5] She concluded that he was. During the second trial, which is the subject of the present appeal, defense counsel asked Dr. Petrick questions about her session with Fontenot. Based upon the information she had obtained, she could not offer a conclusive opinion on whether Fontenot could have knowingly and voluntarily waived his *Miranda* rights prior to his confession.

Defense counsel also questioned Dr. Petrick about some additions she made to her original report, in which she initially concluded Fontenot was competent to stand trial. While her competency determination was unconditional, Dr. Petrick also mentioned that Fontenot might need assistance in understanding legal terminology.[6] After the first trial in August of 1986, Dr. Petrick generated a supplemental competency report in response to Fontenot's then appellate counsel. She stated in that report that Fontenot had been competent to stand trial but added the stipulation "that he receive assistance in the area of legal terminology." Dr. Petrick also stated in this supplemental report that Fontenot did not understand the implications of a confession when he was arrested. During the second trial, Dr. Petrick testified that she

---

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. Dr. Petrick evaluated Fontenot prior to the first trial.

6. When Dr. Petrick interviewed Fontenot, he apparently did not understand and appreciate the district attorney's role in his prosecution. He also referred to the statement he had given to the police as a "confessment."

did not consider these additions to be changes in her original report, but merely detailed elaborations on conclusions already reached.

Dr. Joel Dryer evaluated Fontenot on May 23, 1988, just prior to the second trial, at defense counsel's request. Dr. Dryer ultimately concluded that Fontenot suffered from "post-traumatic stress disorder," but that he did not kill Donna Harraway. This conclusion was based in part on his review of a psychological report written by a doctor who had analyzed Fontenot when he was six years old. Dr. Dryer also obtained information about Fontenot's mother. Fontenot witnessed and apparently felt responsible for his mother's death. According to Dr. Dryer, Fontenot wanted to die. Dr. Dryer concluded that Fontenot's guilt and death wish, coupled with his loneliness and desire for attention, caused Fontenot falsely to confess to the murder of Donna Harraway.

Fontenot claims that the testimony of Drs. Petrick and Dryer, the testimony of witnesses who stated that he was prone to exaggeration, and the fact that he was a twenty year old with a twelfth grade education, together support his claim that he was incapable of giving a knowing and voluntary confession. Even if we were to find Fontenot's mental condition to be a significant factor in the voluntariness calculation, the dispositive inquiry is whether police misconduct contributed to the confession. *See Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). We therefore turn to Fontenot's allegations of improper interrogation techniques.

An officer read the *Miranda* warnings to Fontenot at the beginning of his October 19, 1984, videotaped confession. Fontenot stated that he understood his rights and agreed to talk to the police. Agent Gary Rogers then asked Fontenot if he was giving the statement freely and voluntarily; Fontenot stated that he was.

Agent Rogers and Captain Dennis Smith were present during the interrogation. They each acknowledged that the videotaping did not commence until almost two hours after Fontenot had entered the police station. Both Rogers and Smith also testified that during this two hour time period, they did not supply Fontenot with any of the information surrounding the death of Mrs. Harraway, other than to tell Fontenot that Tommy Ward had confessed and implicated him. Rogers and Smith also denied ever threatening or coercing Fontenot in any manner.

Fontenot claims that to fully appreciate the degree of police misconduct to which he was subjected, we must consider three other instances of separate but related improper police behavior toward other people involved in the case. First, Fontenot offers the circumstances surrounding Tommy Ward's confession. However, the evidence allegedly supporting these claims is contained in the transcripts from the first trial, which is not at issue here. Because there is no evidence in the record now before this Court to support these particular claims, we will not address them.

As his second argument in support of police misconduct, Fontenot points to the manner in which the police allegedly interrogated former suspect and defendant Odell Titsworth.[7] Fontenot claims that during Titsworth's three or four interrogation sessions, Captain Smith and Detective Mike Baskin repeatedly fed him facts about the Harraway case. However, when asked during preliminary hearing whether he had learned facts about the case from these officers, Titsworth initially replied "Not really." P.Hrg.Tr. 809. Titsworth later contradicted himself, stating that the officers had told him facts about the crimes which he did not already know.

Finally, Fontenot describes two instances of police misconduct directed toward him **after** his confession and argues that these incidents are indicative of their mistreatment of

7. In their confessions, Fontenot and Ward told police that Odell Titsworth was the third party involved in Mrs. Harraway's abduction and ultimate death. They claimed Titsworth instigated the crimes. Titsworth was eventually exonerated, however, when the police determined that several days before Mrs. Harraway's disappearance, he had suffered a debilitating spiral fracture of the arm which would have rendered him incapable of helping to abduct and murder her.

him **during** the confession.[8] The first involved Titsworth. Captain Smith testified that a few days after Fontenot's confession, he took Titsworth to Fontenot's cell to see if Fontenot could identify him. While there, Smith asked Titsworth if he would like to enter Fontenot's cell and "settle the score." Titsworth was never in fact allowed to enter the cell.

The second incident involved Fontenot, Smith and Baskin. Smith admitted that after the confession, he and Detective Baskin took a sack of human bones to Fontenot's cell in an effort to persuade Fontenot to tell them where Mrs. Harraway's body was located. Baskin admitted that this was an improper tactic, and that the district attorney prosecuting the case had not been pleased with the maneuver.

██ Some of these incidents are disturbing. However, they occurred either before or after but not during Fontenot's confession. Fontenot has failed to cite and our research has not uncovered any case which holds that a confession can be found involuntary on the basis of police misconduct directed toward someone other than the confessor, or directed toward the confessor after the statement at issue was given.

Fontenot has presented no evidence of police misconduct directed toward him either just prior to or during his confession. Even if Fontenot was not very intelligent and perhaps mentally unstable, there is no evidence that the police exploited these possible weaknesses and coerced him into confessing. After careful consideration of all relevant, surrounding circumstances, we find that Fontenot's confession was voluntarily given. This proposition is denied.

██ In his second proposition, Fontenot argues that the evidence was insufficient to sustain his convictions. He first claims his confession cannot be considered competent evidence, since the State failed independently to establish the **corpus delicti**[9] of the crimes charged. Fontenot also claims his confession was unreliable and thus cannot support his convictions. He maintains that because the State failed to present independent evidence to corroborate his confession, it was rendered untrustworthy.

██ Although the relatively simple question is whether Fontenot's confession was sufficiently reliable to support his convictions, this Court in prior opinions has obscured the proper method of resolving the issue. We have previously utilized together two separate and contradictory analyses when addressing whether a defendant's confession was competent to support a conviction. First, we determined whether the State provided substantial, independent evidence of the **corpus delicti** of the crime charged. Then, we determined whether the State provided independent evidence substantially corroborating the confession. *See Thornburgh v. State,* 815 P.2d 186 (Okl.Cr. 1991); *Williamson v. State,* 812 P.2d 384, 397 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). If the State presents independent evidence of the **corpus delicti** as well as additional corroborating evidence, the confession is deemed competent evidence upon which a conviction may be based. We now reject the **corpus delicti** line of analysis and reaffirm this Court's prior adoption of the standard which requires only that a confession be sup-

8. Again, Fontenot cites extensively to the transcripts from the first trial. We will limit our review to evidence generated by the second trial, which is now at issue before this Court.

9. **Corpus delicti** means the body or substance of the crime charged. 27 *Wharton's Criminal Law* 142 (14th ed. 1978). It consists of two elements: a criminally prohibited injury and a criminally prohibited act as its cause. This Court has consistently restated this definition as "the substantial and fundamental fact or facts necessary to the commission of a crime, and means when applied to any particular offense, the actual com-

mission by some one of [the] particular offense charged." *State ex rel. Peterson v. Ward,* 707 P.2d 1217, 1219 (Okl.Cr.1985). The issue in this case is not whether the State must prove the **corpus delicti** of a charged crime in order to obtain a conviction. It is obvious that by proving beyond a reasonable doubt the elements of a given crime, the State automatically proves the **corpus delicti**. Rather, the issue in this case is whether the **corpus delicti** of the charged crime must be proven by evidence independent of a defendant's extra judicial confession, before that confession may be admitted into evidence for the jury to consider.

ported by "substantial independent evidence which would tend to establish ... [its] trustworthiness...." *Opper v. United States,* 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954), *adopted in Jones v. State,* 555 P.2d 63, 68 (Okl.Cr.1976).

Federal Courts also apply the *Opper* standard exclusively. In fact, the United States Court of Appeals for the Seventh Circuit has held that "the **corpus delicti** rule no longer exists in the federal system, ..." because it failed to serve its original purpose. *United States v. Kerley,* 838 F.2d 932, 940 (7th Cir. 1988). Accordingly, the competence of a defendant's confession is conditioned upon the government having provided " 'substantial independent evidence which would tend to establish [its] trustworthiness....' " *Id.* at 940, *quoting Opper, supra,* 348 U.S. at 93, 75 S.Ct. at 164.

 The State in the present case did provide sufficient, corroborative evidence independent of Fontenot's confession to show its trustworthiness and thus its competence.[10] First, Fontenot made two extrajudicial, post-crime statements in addition to confessing to the police. He told a friend that he knew facts about the Harraway abduction—specifically the perpetrator's identity. And, while he was awaiting trial in the county jail, a fellow inmate overheard him saying "I knew we'd get caught." Tr. II 8.[11]

Second, in accordance with Fontenot's account of the abduction, three witnesses saw Mrs. Harraway leaving the convenience store with a man on the day she disappeared. They saw this man take her to an old, gray primered Chevy pick-up, which Fontenot had described. They saw her enter from the passenger side, with the man following—just as Fontenot had described.

Third, an insurance agent testified that he had insured an old, gray primered Chevy truck for its owner—former codefendant Ward's brother. A witness who knew both Ward and Fontenot testified that the two were friends and that he had seen them riding around together in a gray primered Chevy pick-up. Fourth, one witness who had entered McAnally's (the convenience store from which Mrs. Harraway was abducted) just before the abduction testified that he had seen two men generally matching Fontenot's and Ward's descriptions inside the store. The two men were driving an old, gray primered pick-up. One of the men acted as if he wanted the witness to leave.

Fifth, another witness who worked just one-fourth of a mile down the road at another convenience store testified about having seen two men meeting Ward's and Fontenot's descriptions in her store earlier on the evening of Mrs. Harraway's abduction. She described the truck they were driving as red and gray primered. The two resembled Fontenot and Ward. They were watching her and she felt uncomfortable. When they left at around 8:30 or 9:00 p.m., they headed toward McAnally's.

10. We note that the State's independent evidence need not have established the essential elements of each of the charged crimes of kidnapping, robbery and murder: "It is well settled, ... that there need not be corroborative evidence proving every element of the offense before an admission can be received in evidence." *United States v. Davanzo,* 699 F.2d 1097, 1100–01 (11th Cir. 1983). To reemphasize, the corroborative evidence had to have been sufficiently substantial to establish the trustworthiness of Fontenot's statement. *See Opper, supra.*

11. Fontenot's two admissions did not themselves require independent corroboration prior to being introduced to the jury. "An 'admission' is something less than a confession and is but an acknowledgment of some fact or circumstance which in itself is insufficient to authorize conviction and which tends only toward the proof of the ultimate fact of guilt; whereas a 'confession' leaves nothing to be determined in that it declares defendant's intentional participation in a criminal act, and it must be a statement of such nature that no other inference than that of guilt may be drawn therefrom." *Brewer v. State,* 414 P.2d 559, 563 (Okl.Cr.1966) (citation omitted). Fontenot's two admissions only **tended to prove** his guilt; they alone could not have supported his guilt. Thus, these admissions did not rise to the level of confessions and did not require independent corroboration before their introduction to the jury. *But see Opper, supra,* 348 U.S. at 89–90, 75 S.Ct. at 162–63 ("[A]n accused's admissions of essential facts or elements of the crime, subsequent to the crime, are of the same character as confessions and [thus] corroboration should be required."). These two admissions may properly be considered as part of the State's independent evidence tending to establish the trustworthiness of Fontenot's confession.

Sixth, the manager of McAnally's testified that $167.00 had been taken from the store. Fontenot stated in his confession that they had taken about $150.00 during the robbery. Seventh, the blouse Mrs. Harraway was wearing on the evening of her abduction was buttoned up the front and had lace around the collar and cuffs. Fontenot said in his confession that she had worn a blouse with "ruffles" around the sleeves and collar and elastic in the sleeves.

Eighth, the shoes found with Mrs. Harraway's remains were soft-soled, canvas shoes. Mrs. Harraway's husband had characterized these shoes as "tennis" shoes. However, Fontenot gave a more accurate description of them. He specifically described Mrs. Harraway's shoes as "soft-soled" shoes, stating that they were not tennis shoes.[12]

Ninth, and most generally, there was considerable testimony describing Mrs. Harraway's life: her somewhat recent marriage; her eager anticipation of a teaching degree; her overall happiness and contentment; and, her dedication to her job responsibilities. This testimony corroborated Fontenot's statement that Mrs. Harraway did not willingly leave McAnally's, but was abducted.

Fontenot first attacks these corroborating facts on the grounds that much of what he said to the police was simply a regurgitation of what they had already "fed" to him. However, we established in the discussion of the first proposition that there was no evidence to support this allegation. Fontenot also tries to cast doubt on the strength of the corroborating facts by pointing to the following inconsistencies between his confession and the evidence: he said Mrs. Harraway had been stabbed to death, but a bullet wound was found in her skull and her remains did not indicate that she had been stabbed; her body was not found where he said it would be; her body showed no signs of having been burned, whereas Fontenot said they had set fire to her body; and, Odell Titsworth, whom Fontenot originally implicated in his confession, was ultimately exonerated.

 While these inconsistencies were by no means inconsequential, we do not believe they rendered Fontenot's confession untrustworthy and incompetent. The only means of calculating the trustworthiness of Fontenot's statement is to review all the other independent evidence and determine whether it is sufficiently corroborative to suggest that Fontenot's admission of guilt was truthful. This standard does not require that each material element of the charged offenses be corroborated by facts independent of the confession[13], or that there be no inconsistencies whatsoever between the facts proven and the facts related in the confession.[14] Unless inconsistencies between the confession and the other evidence so overwhelm the similarities that the confession is rendered untrustworthy, it remains within the province of the jury to determine whether the confession is credible. *See Crane v. Kentucky,* 476 U.S. 683, 688, 106 S.Ct. 2142, 2145, 90 L.Ed.2d 636 (1986), *citing Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), ("[Q]uestions of credibility, whether of a witness or of a confession, are for the jury,...."). *See also Maxwell v. State,* 742 P.2d 1165, 1169 (Okl.Cr.1987) (noting that in reviewing the sufficiency of the

12. During oral argument, held before this Court on December 7, 1993, Fontenot's appellate counsel stated that information about Mrs. Harraway's shoes had not been made public prior to his confession.

13. *See Davanzo, supra* n. 10. We must also mention that our holding does not conflict with OUJI–CR–814. *See infra* n. 15. The "material and basic fact or facts necessary for the commission of the offense charged" need not include the elements of the crime. Rather, the facts provided in the confession which the independent evidence must corroborate must be facts which are relevant to and significantly related to the commission of the offense or offenses.

14. In *Williamson, supra,* 812 P.2d at 397, this Court stated that "the **essential facts** were corroborated despite the inconsistencies between the State's evidence and the defendant's confession." (Emphasis added). When making the legal determination whether a confession has been sufficiently corroborated by independent evidence, however, we do not believe that any fact is necessarily more "essential" than any other. Rather, the focus should be on the overall consistencies and/or discrepancies between the confession and the other evidence presented.

evidence on appeal, an appellate court must accept all reasonable inferences and credibility choices that tend to support the decision of the trier of fact.).

After reviewing Fontenot's confession, the independent corroborative evidence and the alleged inconsistencies, we find that his confession was trustworthy. Accordingly, it was competent evidence which the jury was entitled to consider against him. The jury was informed of the inconsistencies between Fontenot's confession and the other evidence presented, and it chose to believe Fontenot when he stated that he participated in the robbery and in Mrs. Harraway's subsequent abduction and murder. A rational trier of fact faced with this evidence could have found Fontenot guilty beyond a reasonable

doubt of the crimes charged. *See Rawlings v. State,* 740 P.2d 153, 160 (Okl.Cr.1987). *See also Crawford, supra,* 840 P.2d at 632.

 To summarize, we now hold that whether an accused's confession is competent to support a conviction depends not upon whether substantial evidence of the **corpus delicti**[15] of the crime has been introduced, but upon whether the confession is trustworthy. A confession may be considered trustworthy if it is corroborated by substantial, independent evidence. Under Oklahoma statutory law, the only fact which may not be proven by an accused's properly admitted confession is the fact that a death occurred.[16]

 In the present case, the evidence the State presented independent of Fontenot's

---

**15.** Our decision to abolish the requirement that the **corpus delicti** of a charged crime must be substantially and independently proven before an accused's confession may be considered competent evidence does not conflict with 21 O.S.1981, § 693, "Proof necessary to conviction of murder or manslaughter." Section 693 states that

> [n]o person can be convicted of murder or manslaughter, or of aiding suicide, unless the death of the person alleged to have been killed and the fact of the killing by the accused are each established as independent facts beyond a reasonable doubt.

We believe this section was intended only to prohibit the State from using a defendant's confession to prove that a death occurred. *See State v. Gibson,* 69 N.D. 70, 284 N.W. 209 (1938) (in response to defendant's claim that section 693 prototype prohibited the State from using his confession to prove that he killed the victim, court held only the fact of the victim's death must be established by direct proof supplied by evidence independent of the confession). "The fact of the killing" which must be proven as an independent fact and beyond a reasonable doubt, may indeed be proven by a defendant's own properly admitted confession.

This Court has mistakenly construed section 693 as a "super" **corpus delicti** rule requiring "that the **corpus delicti** of [a] homicide be established independent of the confession or statement by the defendant, **beyond a reasonable doubt.**" *State ex rel. Peterson v. Ward,* 707 P.2d 1217, 1219, n. 1 (Okl.Cr.1985) (emphasis added). That interpretation of section 693 is too broad. Interestingly, it has not been consistently applied in homicide cases. *See Thornburgh, supra,* 815 P.2d at 187 (The prosecution "is not required to prove the **corpus delicti** beyond a reasonable doubt independent of a defendant's confession." (Emphasis added).

Because section 693 has been misconstrued, the jury instruction based upon it is incorrect

and must be altered. OUJI–CR–815 reads as follows:

> No person may be convicted of [any homicide] unless both the fact of the death of the person allegedly killed and the fact that his/her death was caused by the conduct of another person are established as independent facts and beyond a reasonable doubt. **Such proof must consist of evidence which is wholly independent of any [confession] made by the defendant(s). Such evidence, however, may be circumstantial and need not include proof of the identity of the person who caused the death.**

(Emphasis added). The unhighlighted portion of the instruction is almost verbatim section 693 and shall remain as is. The highlighted portion is incorrect and must be excised.

Additionally, OUJI–CR–814 shall henceforth be administered in homicide cases in which a defendant has given a properly admitted extrajudicial confession. The pertinent portion of that instruction reads as follows:

> A confession alone does not justify a conviction unless it is corroborated, that is, confirmed and supported by other evidence of the material and basic fact or facts necessary for the commission of the offense charged. Unless you find that the confession, if made, is corroborated, you must disregard it.

Because of this Court's overly broad interpretation of section 693, the caption before and notes after OUJI–CR–814 admonish trial judges not to administer this particular instruction in homicide cases. Rather, trial judges are told to administer OUJI–CR–815, the instruction outlined in the preceding paragraphs. Again, OUJI–CR–815 must be altered to reflect both the actual language of section 693 and today's decision adopting the trustworthiness test for extrajudicial confessions. Both OUJI–CR–815 as altered and OUJI–CR–814 must be administered from now on in all cases in which a defendant's extrajudicial confession has been properly admitted.

**16.** *See* 21 O.S.1981, § 693, *supra* n. 15.

confession was sufficiently corroborative of the confession to render it trustworthy. The discovery of Mrs. Harraway's remains provided independent proof of her death as required by section 693. Accordingly, the evidence properly presented at trial was sufficient to support Fontenot's convictions for robbery, kidnapping and murder. Fontenot's second proposition is denied.

Fontenot argues in his third proposition that in an effort to corroborate his confession, the State elicited testimony describing key portions of Tommy Ward's confession which had been ruled unreliable and inadmissible by this Court in *Fontenot v. State, supra*. Fontenot also claims that some of this testimony constituted inadmissible hearsay the introduction of which violated his Sixth Amendment right to confront witnesses against him. We will separately review each contested portion of testimony and the corresponding claims against them.

■ First, in response to defense counsel's question to Detective Smith asking whether he had been given a description of Mrs. Harraway's blouse prior to interviewing Fontenot, Smith replied "From Tommy Ward." Tr. III, 116. Fontenot argues that Smith's answer was not responsive to the question, and was calculated to emphasize to the jury the fact that Ward had implicated Fontenot. Fontenot claims the prejudice caused by this statement was reemphasized by the State on redirect examination. At that time, Smith testified that because both Ward and Fontenot had given the same description of the blouse Mrs. Harraway had been wearing, the blouse description became an important piece of inculpatory evidence against Fontenot.

■ We first note that none of Ward's inadmissible **statements** were actually placed before the jury. Thus, this Court's ruling in *Fontenot, supra*, was not violated. And, the testimony can not be considered hearsay, which is defined as "a **statement,** other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted; ...." 12 O.S.1981, § 2801(3) (emphasis added).

■ Further, defense counsel placed the emphasis on the connection between Ward's and Fontenot's confessions. At the beginning of cross-examination of Captain Smith and prior to the complained of testimony, defense counsel said to Smith, "[Y]ou had information that connected Tommy Ward, Karl Fontenot and Odell Titsworth, did you not?" Tr. III, 100. Defense counsel then asked Smith what Agent Rogers had said to Fontenot in order to convince him to stop denying his involvement in the Harraway abduction. In response, Smith testified that Rogers had said "Karl, we have already talked to Tommy and we have a confession from him." Tr. III, 104. These connections between Ward's and Fontenot's statements were clearly offered or invited by defense counsel. Fontenot has no basis upon which to complain of these alleged errors. *See Price v. State,* 782 P.2d 143 (Okl.Cr.1989). *See also Penn v. State,* 684 P.2d 562, 564 (Okl.Cr.1984).

The second portion of testimony Fontenot attacks concerns Captain Smith's statement that prior to Fontenot's confession, he told Fontenot that the police had spoken with Ward and had obtained a confession from him. Smith later responded to a defense question by stating "Tommy Ward said that." Finally, Smith, again responding to defense questions, referred to the "confessions" and what "they said" in the confessions. Again, our review of the transcript indicates all of these responses were elicited and encouraged by defense counsel.

■ The third and final portion of testimony Fontenot claims was prejudicial involves Agent Rogers's descriptions of several actions he took as a result of his interview with Ward. In accordance with defense counsel's objection, Rogers never related anything Ward had **said** to him. Rather, he described to the jury what he **did** as a result of their conversation.

Rogers made three calls to Detective Baskin. He first directed Baskin to search for Mrs. Harraway's remains in an area around a local power plant. In a second call, Rogers told Baskin to look for an incinerated house on the property surrounding the power plant.

Lastly, Rogers told Baskin to try to locate a concrete bunker or hole in the ground on that property.

Fontenot claims Rogers's testimony describing what he did as a result of his interview with Ward constituted inadmissible hearsay. In attacking this testimony, however, Fontenot concedes that the hearsay rule does not preclude a witness from testifying about the actions he or she took as a result of a conversation with a third party. *See Greer v. State,* 763 P.2d 106, 108 (Okl.Cr.1988). The thrust of Fontenot's claim is that this testimony so conclusively connected Fontenot's and Ward's confessions as to apprise the jury that Ward had in fact inculpated Fontenot as well as himself. According to Fontenot, the admission of this testimony violated this Court's ruling in *Washington v. State,* 568 P.2d 301 (Okl.Cr.1977). We disagree.

In *Washington,* a police officer had spoken to an eyewitness. During direct examination at trial, the prosecutor asked the officer what actions he had taken in response to the information this eyewitness had given him. The officer replied that after having spoken to the eyewitness, he directed his investigation toward the defendant. This Court held that this officer's testimony constituted error, although it was ultimately ruled harmless. We reasoned that while a witness may tell the jury about actions taken in response to information received from a nontestifying third party, such testimony is rendered inadmissible when it effectively points the "finger of accusation" at the defendant. *Id.* at 309–10. In other words, the State may not indirectly accomplish what the hearsay rule directly forbids.

Detective Smith's testimony did not point the finger of accusation at Fontenot and did not, therefore, constitute the type of evidence criticized in *Washington.* After talking with Ward, Smith ordered Baskins to search a certain area for Mrs. Harraway's remains. He described where her body might have been placed. Smith's testimony hardly suggested to the jury that Ward had inculpated Fontenot. This proposition is denied.

Fontenot claims in his fourth proposition that his convictions must be reversed because prejudicial other crimes evidence was improperly admitted against him. In his confession, Fontenot admitted to having raped Mrs. Harraway. Both before and during the second trial, each side vigorously argued their respective positions on the issue of whether the references to the rape should be deleted from the videotaped confession. The trial judge ultimately ruled that Fontenot's statements concerning the rape were admissible under the **res gestae** exception to the prohibition against admission of other crimes evidence.

Fontenot's attack upon the rape evidence is based primarily on language from this Court's opinion in *State ex rel. Peterson, supra.* Fontenot and Ward were originally charged prior to the first trial with having raped Mrs. Harraway. Each rape count was dismissed by the preliminary hearing magistrate, and the State appealed this ruling. In *State ex rel. Peterson,* this Court reviewed the State's claim and reinstated the rape charges, concluding that the State had met its preliminary hearing burden. *Id.* at 1219. However, this Court then went on to caution the State that if it could not strengthen its case on the rape counts, the charges should be dismissed and "all references to [that crime] should be deleted from the . . . confessions." *Id.*[17]

We first note that this Court's decision in *State ex rel. Peterson, supra,* has no bearing upon the issue now before us. In cautioning the State to delete all references to the rape if the charges for that offense were dropped, we were not addressing the specific issue raised here, i.e. whether the rape evidence constituted part of the **res gestae** of the crimes for which Ward and Fontenot were on trial. The legal arguments for and against admission of the rape evidence as part of the **res gestae** had not been presented in that Rule Six appeal, and we did not consider them. Accordingly, we will now address Fontenot's "other crimes" argument on its merits.

**17.** The rape charges against both Ward and Fon-tenot were eventually dropped.

After reviewing Fontenot's "other crimes" contention, we conclude that the description of Mrs. Harraway's rape contained in the videotaped confession was properly admitted as part of the **res gestae** of the charged offenses. The evidence helped to "complete a full picture of the transaction," and was properly introduced to present to the jury "enough facts to understand the full sequence of events." *Johnson v. State*, 760 P.2d 838, 840 (Okl.Cr.1988) (Parks, J., Specially Concurring). Without this evidence, Fontenot's account of the facts leading to the murder of Mrs. Harraway would have been nonsensical. "Inexplicable gaps" would have left the jury without a clear picture of the events during those time periods. *See Dunagan v. State*, 755 P.2d 102, 104 (Okl.Cr. 1988). *See also Carter v. State*, 698 P.2d 22, 25 (Okl.Cr.1985).

Further, the probative value of this evidence was not outweighed by the danger of unfair prejudice. *See* 12 O.S.1981, § 2403. Although Fontenot's account of the rape portrayed him as cruel and callous, omitting this evidence might have left the jury with the more damaging impression that he had committed the murder for absolutely no reason. The portions of Fontenot's confession in which he describes his participation in the raping of Mrs. Harraway constituted part of the **res gestae** of the charged offenses and was properly admitted.[18] This proposition is denied.

In his fifth proposition, Fontenot claims that the trial court's failure to instruct the jury on the defense of voluntary intoxication and on the lesser included offense of second degree murder violated[19] his right to due process. Both instructions were requested. Accordingly, any alleged error was preserved for review.

In his confession, Fontenot stated that prior to committing the offenses against Mrs. Harraway, he had smoked some "pot," "gotten high," and had been drinking "some." Fontenot argues that once the trial judge ruled his confession reliable, all the information contained in that confession had to have been considered truthful. Accordingly, the trial judge should have considered Fontenot's descriptions of his pre-crime cognitive state to be evidence which conclusively supported a voluntary intoxication defense. We disagree.

Fontenot was entitled to an instruction on the defense of voluntary intoxication only if there was sufficient evidence of impairment "to raise a reasonable doubt as to his ability to form the requisite criminal intent" to commit first degree murder. *Calhoun v. State*, 820 P.2d 819, 822 (Okl.Cr. 1991). *See also Sellers v. State*, 809 P.2d 676, 686–87 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991). If supported by the evidence, voluntary intoxication may negate the "intent to kill" **mens rea** element of first degree murder. *See Stanley v. State*, 762 P.2d 946, 949 (Okl. Cr.1988), *citing Williams v. State*, 513 P.2d 335 (Okl.Cr.1973).

While Fontenot did confess to drinking some liquor and smoking some marijuana prior to abducting Mrs. Harraway, this evidence did not raise a reasonable doubt as to

---

18. Fontenot also claims that even if the rape evidence constituted part of the **res gestae** of the charged offenses, it did not meet the "clear and convincing" level or proof required by *Burks v. State*, 594 P.2d 771 (Okl.Cr.1979), *reversed on other grounds, Jones v. State*, 772 P.2d 922, 925 (Okl.Cr.1989), because there was no independent evidence of the **corpus delicti** of the rape. However, none of the *Burks* requirements apply to res gestae evidence. *See Dean v. State*, 764 P.2d 1355, 1356 (Okl.Cr.1988); *Duvall v. State*, 780 P.2d 1178, 1180 (Okl.Cr.1989). Accordingly, we need not determine whether the evidence of the rape was "clear and convincing."

19. Fontenot argues that the trial court's failure to administer his requested instruction on the non-capital offense of second degree murder violated the United States Supreme Court's holding in *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), as reaffirmed in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). In *Beck*, the Supreme Court concluded that in capital cases, a defendant is constitutionally entitled to an instruction on a lesser-included, noncapital offense where the evidence would support the lesser offense. We note that neither *Beck* nor *Schad* were implicated in the present case, since the jury did in fact receive an instruction on the noncapital offense of first degree heat of passion manslaughter.

his ability to form the intent to kill her. He never stated that his judgment was in any way impaired by having drunk alcohol or smoked marijuana, or that his actions were in any way caused by his impaired mental state. Further, there were no gaps in his account of what occurred to suggest that he might have been dazed during the events leading to Mrs. Harraway's death. *See Calhoun, supra,* at 822. *See also Banks v. State,* 810 P.2d 1286, 1294 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 883, 116 L.Ed.2d 787 (1992). The trial judge did not abuse his discretion in refusing to administer Fontenot's requested voluntary intoxication defense instruction.[20]

 Fontenot also claims the trial court erred in refusing to administer his requested instruction on the lesser offense of second degree murder. He was entitled to a lesser included offense instruction only if the evidence was sufficient to support it. *See Boyd v. State,* 839 P.2d 1363, 1367 (Okl.Cr. 1992). *See also Williams v. State,* 807 P.2d 271, 274–75 (Okl.Cr.1991). Apart from the alleged evidence of intoxication, Fontenot provides no evidentiary justification for the second degree murder instruction. We have already determined that there was not sufficient evidence to support a voluntary intoxication instruction. Accordingly, there was not sufficient evidence under Fontenot's theory to support the second degree murder instruction. This proposition is denied.

Fontenot argues in his sixth proposition that the trial court committed reversible error in administering a modified version of OUJI–CR–804, when he had requested the unmodified version of that instruction. The instruction administered, with the highlighted portion indicating the trial court's additional phrase, reads as follows:

The State relies [in part] for a conviction upon circumstantial evidence. In order to warrant conviction of a crime upon circumstantial evidence, each fact necessary to prove the guilt of the defendant(s) must be established by the evidence beyond a reasonable doubt. All the facts necessary to such proof must be consistent with each other and with the conclusion of guilt the state seeks to establish. **It is not necessary that the circumstances proven exclude every theory or negate any possibility other than guilty, but** [a]ll of the facts and circumstances, taken together, must be inconsistent with any reasonable theory or conclusion of a defendant's innocence. All of the facts and circumstances, taken together, must establish to your satisfaction the guilt of the defendant(s) beyond a reasonable doubt.

O.R. 182. Fontenot argues that the trial court's additional phrase allowed the jury to discount the discrepancies in the State's evidence, and that the jury could have interpreted it as authorizing his conviction even if the evidence **negated** his guilt. The State argues that the modified instruction correctly stated the applicable law and was therefore proper.

 Generally speaking, when a jury must be instructed on a certain subject, the relevant uniform instruction "**shall** be used unless the court determines that it does not accurately state the law." *Palmer v. State,* 788 P.2d 404, 408 (Okl.Cr.1990), *citing* 12 O.S.1991, § 577.2 (emphasis in original). Failure to follow this general rule, however, does not warrant automatic reversal. *See Smallwood v. State,* 763 P.2d 142, 144 (Okl. Cr.1988). Rather, the overriding concern on appeal is whether the instruction at issue fairly and accurately stated the applicable law. *Id. See also Sellers v. State, supra,*

20. It is important to note that the trial court did administer one of Fontenot's requested instructions which allowed the jury to consider the circumstances surrounding Mrs. Harraway's death in determining whether he had formed the requisite intent to kill her. That instruction reads as follows:

The external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent

existed in the mind of the defendant to take a human life. External circumstances include words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act.

O.R. 176. Although Fontenot's jury did not receive the voluntary intoxication instruction, the above-quoted instruction allowed it to consider **all circumstances surrounding the homicidal act** in determining whether he had the requisite intent to kill.

809 P.2d at 685. Even if error was committed, reversal is not required unless such error "resulted in a miscarriage of justice or constituted a substantial violation of a constitutional or statutory right." *Brown v. State,* 777 P.2d 1355, 1358 (Okl.Cr.1989), *citing* 20 O.S.1991, § 3001.1.

Fontenot concedes the trial court's modifying phrase mirrors this Court's language in several opinions. *See R.D.O. v. State,* 735 P.2d 1198, 1200 (Okl.Cr.1987); *Banks v. State,* 728 P.2d 497 (Okl.Cr.1986). He claims this is the appropriate appellate review standard, but that it is incorrect, confusing and prejudicially misleading when included in a jury instruction. We disagree.

■ While the better and safer practice would have been to administer the uniform instruction as written, the trial court's additional phrase rendered the instruction neither erroneous nor prejudicial. The uniform portion of the instruction administered correctly informed the jury that the circumstantial evidence against Fontenot would support a conviction only if it were found to be inconsistent with any **reasonable** theory of his innocence. The trial court's additional phrase merely explained to the jury the inverse of this standard, i.e., that it could rely on the circumstantial evidence for a conviction even if such evidence failed to exclude **all possibilities** other than Fontenot's guilt. This proposition is denied.

■ In his fifteenth proposition, Fontenot claims that prosecutorial misconduct during closing argument constituted fundamental, reversible error. Fontenot claims that the prosecutor made six improper comments during first stage closing arguments. Five of these comments received no objection and will be reviewed for fundamental error only. *See Trice, supra,* 853 P.2d at 214. *See also Huntley v. State,* 750 P.2d 1134, 1136 (Okl. Cr.1988). Our review of these five comments reveals no error which went to the foundation of Fontenot's case or deprived him of a right essential to his defense. *See West v. State,* 764 P.2d 528 (Okl.Cr.1988). Accordingly, they do not support Fontenot's claim for reversal.

■ In the comment which was met with a contemporaneous objection, the prosecutor referred to one of the books of the Bible. He said this particular book of the Bible states there is a time to live and a time to die, that God did not intend for Mrs. Harraway to die on March 28, 1984, and that Fontenot and Ward decided she would die on that day. Closing argument during a criminal trial should not include biblical references. Even though the prosecutor's mention of the Bible in the present case was improper, the question on appeal is whether the comment deprived Fontenot of his right to a fair trial. *See Pickens v. State,* 850 P.2d 328, 343 (Okl.Cr.1993). While the prosecutor did specifically refer to biblical passages, he did not encourage the jury to follow biblical standards rather than the Court's instructions. Rather, he used the biblical passage at issue to emphasize what the evidence showed: that Mrs. Harraway died at the hands of human beings. In light of the substantial evidence of guilt and the relatively innocuous nature of this comment, it cannot be said that the prosecutor's reference to the Bible deprived Fontenot of his right to a fair trial. This proposition is denied.

## ISSUES RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL

Fontenot claims in his sixteenth proposition that ineffective assistance of counsel denied him his right to a fair trial. Fontenot argues that defense counsel at trial failed to investigate issues central to his case. He also claims his attorney failed to properly utilize available evidence that would have strengthened his defense.

Fontenot first alleges there was evidence that the gray primered truck he and Ward allegedly used to abduct Mrs. Harraway did not belong to Ward's brother. During Fontenot's trial, an insurance agent testified that he had insured for Ward's brother a truck that matched the gray primered truck's description. During Ward's trial, Ward's brother as well as other witnesses testified that he [Ward's brother] did not in fact own a gray primered Chevy pick-up. Fontenot suggests that this evidence helped win Ward a sentence of life imprisonment rather than

death. According to Fontenot, defense counsel's failure adequately to investigate this issue and present this impeachment evidence at his trial constituted ineffective assistance of counsel.

■ "Appellate review of an ineffective assistance of counsel claim begins with a presumption of competence, and the burden is upon the defendant to demonstrate both a deficient performance and resulting prejudice." *Strickland v. Washington*, 466 U.S. 668, 687–89, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). The ultimate test is whether, but for the allegedly deficient performance, the result of the trial would have been different. *Id.* at 694, 104 S.Ct. at 2068. *See also Lockhart v. Fretwell,* — U.S. —, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The fact that a defense attorney could have investigated an issue more thoroughly does not, in and of itself, constitute ineffective assistance. *Williamson v. State, supra,* 812 P.2d at 413; *Boltz v. State,* 806 P.2d 1117, 1126 (Okl.Cr. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991). *See also Dutton v. Brown,* 812 F.2d 593, 598 (10th Cir. 1987) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.") If an ineffective assistance claim "can be disposed of on the ground of lack of prejudice, an appellate court need not determine whether trial counsel's performance was deficient." *Strickland, supra,* 466 U.S. at 697, 104 S.Ct. at 2069.

■ The evidence which Fontenot claims his trial counsel incompetently failed to present during both first and second stage proceedings was not so compelling that its absence reversibly prejudiced Fontenot. Ward's brother's testimony at Ward's retrial, along with that of several other family members, simply rebutted the testimony of the insurance agent. While presenting these witnesses during Fontenot's trial **might** have cast some shadow of doubt upon who exactly owned that gray truck, there is no reasonable probability that it would have.

Further, it must be noted that Ward's retrial occurred one year after Fontenot's. We cannot even determine whether, at the time of Fontenot's retrial, his defense attorney had access to or knowledge of these witnesses, or whether he would have considered the presentation of their testimony wise defense strategy. The manner in which Fontenot's trial counsel chose to develop and present his defense did not prejudice Fontenot and did not, therefore, constitute ineffective assistance.

■ Fontenot also claims trial counsel's failure to object to numerous first and second stage instances of allegedly improper prosecutorial comment constituted ineffective assistance. We concluded in the proposition attacking these comments that they did not rise to the level of fundamental, reversible error. Even if defense counsel had interposed objections to all of these comments, they would not have required reversal. Accordingly, defense counsel's failure to object to these comments did not render him ineffective. This proposition is denied.

Fontenot's convictions and sentences for kidnapping and robbery are **AFFIRMED.** His conviction for first degree murder is also **AFFIRMED,** but his sentence of death must be **VACATED** and this cause **REMANDED** for **RESENTENCING.**

JOHNSON, V.P.J., and LANE and STRUBHAR, JJ., concur.

LUMPKIN, P.J., concurs in part/dissents in part.

LUMPKIN, Presiding Judge, concurring in part/dissenting in part:

I concur with the Court's affirming Appellant's conviction. The Court's excellent analysis in determining the standard discussed in *Opper v. United States,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954) is well taken. The adoption of this more practical approach standard should eliminate the aberrations found in cases such as *Thornburg v. State,* 815 P.2d 186 (Okl.Cr.1991), which I believe to be overruled by this decision.

However, I cannot agree with the result reached in remanding for resentencing based

on *Hain v. State*, 852 P.2d 744 (Okl.Cr.1993) and *Salazar v. State*, 852 P.2d 729 (Okl.Cr. 1993). In adopting that rationale to this set of facts, the Court has gone a step beyond what was even reasonably foreseeable.

I shall not repeat why I believe the underlying premise is faulty here; rather, I stand on my dissents in *Hain* and *Salazar*. However, I am forced to write here because this goes beyond mere *stare decisis*, as the facts amply demonstrate.

The victim was killed in April 1984. Appellant was tried in September 1985. This Court reversed in July 1987. The life without parole provision became effective November 1987. Appellant was retried in June 1988. As a result, this Court seeks to remand once again because a new provision of law went into effect *not* between the time of the act's commission and the time of trial, but *between trials*.

*Stare decisis* is one thing; but following it here would be in direct contravention of the law.

This ruling ignores the changes in 21 O.S.Supp.1993, § 701.10a, dealing with remanding for sentencing. In the new version, the Legislature clarified what should have been obvious, giving the jury the option of choosing any sentence *"authorized by law at the time of the commission of the crime."* 21 O.S.Supp.1993, § 701.10a(1) (emphasis added). The provisions are *specifically intended to apply retroactively.* 21 O.S.Supp.1993, § 701.10a(5) This provision became effective June 7, 1993. This Court's opinion comes down after that time. It should therefore logically control over this Court's *Salazar* ruling, as it is a clear indication of the Legislature that it disagreed with this Court's pronouncements.

The Court in this decision exceeds even what could have been anticipated in allowing an appellant to latch on to the vestiges of *Hain* and *Salazar*. The benefit of foreseeability should be given to the State as well as a defendant; and this case should be a stopping point for reaching back into the past for purposes of attaching a decision upon which an appellant has no clear right to depend.

Therefore, I must respectfully dissent to that portion of the opinion remanding for a new sentencing hearing.

### ORDER DENYING PETITION FOR REHEARING AND DIRECTING ISSUANCE OF MANDATE

Karl Allen Fontenot was tried by a jury and convicted of First Degree Malice Aforethought Murder in violation of 21 O.S.Supp. 1982, § 701.7 (Count III), Kidnapping in violation of 21 O.S.1981, § 741 (Count II), and Robbery with a Dangerous Weapon in violation of 21 O.S.Supp.1982, § 801 (Count I), in the District Court of Hughes County, Case No. CRF–88–43. In accordance with the jury's recommendation, the Honorable Donald E. Powers sentenced Fontenot to twenty years imprisonment for Count I, ten years imprisonment for Count II, and death for Count III.

In a June 8, 1994 published opinion, this Court affirmed Fontenot's convictions on all three counts, but remanded the murder conviction for a new sentencing hearing at which Fontenot was to receive the "life without parole" jury instruction. Fontenot is now before the Court on a Petition for Rehearing, which is governed by Rule 3.14, *Rules of the Court of Criminal Appeals*, 22 O.S.Supp. 1993, Ch. 18, App. According to Rule 3.14, a Petition for Rehearing shall not be filed as a matter of course, but only for two reasons:

(1) That some question decisive of the case and duly submitted by the attorney of record has been overlooked by the Court, or

(2) That the decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument.

The sole proposition Fontenot raises in his Petition for Rehearing does not meet the criteria set forth in Rule 3.14 and will not be addressed.

**IT IS THEREFORE THE ORDER OF THIS COURT** that Fontenot's Petition for Rehearing be **DENIED.** The Clerk of the Court is directed to issue the mandate forthwith.

IT IS SO ORDERED.

**WITNESS OUR HANDS AND THE SEAL OF THIS COURT** this 30th day of September, 1994.

/s/ Gary L. Lumpkin
GARY L. LUMPKIN,
Presiding Judge

/s/ Charles A. Johnson
CHARLES A. JOHNSON,
Vice Presiding Judge

/s/ James F. Lane
JAMES F. LANE,
Judge

/s/ Charles S. Chapel
CHARLES S. CHAPEL,
Judge

/s/ Reta M. Strubhar
RETA M. STRUBHAR,
Judge